The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. Please be seated. We are happy to have you with us today. We are hearing three cases and we can start with our first, number 25-1050. And Mr. Parsley, we will hear from you when you're ready. May it please the Court, Robert Parsley with Bradley for the Appellants, the Stokes and G.S.H. of Alabama. This Court should reverse and remand for further proceedings. We have three main arguments for reversing the district court. First is, excuse me, the Appellants have alleged a plausible common plan that constitutes a conspiracy with a South Carolina company. Can I ask you a question about your conspiracy theory? Yes, Your Honor. So this is the theory and we've adopted it in cases like unspam where you impute the contacts of mobilization funding to the defendant. And we have cases on that. There's a whole three-part standard. Was any of that briefed in front of the district court? It was, Your Honor. How so? Did you actually like set out, here's the three-part standard, here's the cases? Because I couldn't even find the word impute anywhere. The conspiracy argument was made in the briefs of the Appellants. What do you mean when you say the conspiracy argument? Well, they argued that there was a conspiracy among the lender and Westfield Construction. There was not citation to unspam or other cases like that. Or the standards or the argument that the contact should be imputed. No, Your Honor. No, there's not, Your Honor. Okay. But a waiver argument has not been made. So I think that would be a waiver of the waiver. Oh, and the other point is the district court did conclude that a conspiracy had not been alleged. So I think we're safe to make that argument. So on that front, can I ask you on the merits? Yes. This case strikes me as fairly similar to Twombly. I assume you know what case Twombly is. Yes. Okay. So I know Twombly is a case about 12b-6, and this is a case about 12b-2. But when I read the Supreme Court's decision in Twombly and when they explain what's wrong with the complaint in Twombly on the merits, they say, like, just because you say the word conspiracy over and over and over again, as the complaint in Twombly did, doesn't mean you've plausibly alleged there's actually a conspiracy. And when I read the complaint in this case, I have sort of the same feeling, like, just because you keep saying the word conspiracy again and again and again, doesn't mean you've plausibly alleged the existence of a conspiracy. So could you identify the best allegations in the complaint? Like, through this Twombly lens, does the complaint plausibly allege the existence of a conspiracy? Beyond the words, beyond the places where the complaint just says the word conspiracy, where does the complaint allege facts that you think make it plausible there is a conspiracy? Good question, Your Honor. We set those out in our brief, both our opening brief, our reply brief. I'll kind of go through those key facts. Okay. In general, the common— See, again, this is what Twombly says we can't do. We can't say in general. I need to know what paragraph of the complaint we're talking about. Yes, Your Honor. I'll be happy to do that. I was just going to summarize the nature of the common plan, which is that these parties induced the Stokes to enter into a joint venture on this Florida construction project to guarantee a construction-related loan for that project with very unfavorable terms, with the representation that proceeds from the owner that would be paid for that work would go, in part, to pay down the loan as well as to pay for expenses and wages. That the money was not used for that purpose. The money was used both for the benefit of Westerfeld and the lender for other purposes. In fact, the appellants were left with some unpaid expenses. And that they seek to protect—the lender seeks to protect itself through these releases. I'm still not hearing references to paragraphs of complaints that allege things. I'm getting to that, Your Honor. Can you show us in the—or tell us in the JA exactly in the complaint where—giving a JA site where this is alleged. So Joint Appendix 175 and 176 provide very specific factual allegations of this relationship, which included a referral payment to Westerfeld. It says that they made false representations to the Stokes to induce them to enter into this agreement. And those representations are set out in detail at Joint Appendix 205, 206. This may be a different section of the complaint, but there's a section of the complaint, if you're referring to this one, where we say, like, there's the CEO of this one company and the CEO of this one company, and they were both working together, and between them they said the following things. But it doesn't tell me who said what. It just literally says one of these two people said each of the following things. That's right, Your Honor. But isn't that, like, really important to know which of these two people said these things? Well, I think the allegation is that both of them, both Mr. Pepper and Mr. Banks— Were in a conspiracy together. —were together making these misrepresentations to the Stokes. And we know very specifically what those misrepresentations were. So let me give you a hypo that captures what I think is basically the problem. Say, you know, I have an apartment, and say I'm a renter. And I enter into a direct deposit agreement with my landlord that allows them to take money out of my account to pay my rent. And then I need to sign up for power, and I live in Virginia, which means I basically have to use Dominion. So I sign up with Dominion, and Dominion can also auto-debit my account to pay for my rent. And the allegation is that both of them take more money than they're allowed to take, right? I mean, that might be bad on one or both of their parts, but that doesn't prove that two of them are in a conspiracy. It just proves that the two of them are both ripping me off maybe. So what in this complaint alleges something that moves me from maybe both of them are taking advantage of your client to they're both taking advantage of your client pursuant to a common scheme or plan sufficient to allow us to impute one of their conduct to the other? Where is that in the complaint? Right. So in the joint appendix, pages 416 and 419, are documents that govern the disbursement of funds. So the documents to which one of them is a party and the other one is not? Correct. And the one that's not a party to these agreements is the one you're trying to get personal jurisdiction over? The one that's not a party to the second agreement, which is Westerfeld. But Westerfeld had the power under the Florida contracts that the payments from the state of Florida came to Westerfeld. It had custody of those payments. It then used those payments, initially placed them in a joint account between the lender and the joint venturer with the Stokes. Later, a funds control agreement was entered into between the lender and Jessup, which gave Westerfeld the ability to place those funds in an account jointly held by Westerfeld and Jessup. And so Westerfeld had the power to disperse funds, to choose where those funds would go. And then it could choose to place some of those funds into a joint account between the lender and Jessup. That shows that Westerfeld was cooperating with the lender to determine where the funds were going to go. And, in fact, Westerfeld had to have the consent. Westerfeld is a general contractor, so that's kind of the role of Westerfeld as a general contractor, right? Right, but it flowed into the loan. The contractor was placing these funds in an account that the lender had control of for purposes of the construction loan. And that was contemplated by both of these agreements of reference. And the allegations in the complaint are very specific, that both the lender and Westerfeld diverted these funds for their own purposes, not to pay down the loan. They didn't pay down one dollar of the loan. Can I ask you a slightly different question? Under our conspiracy jurisdictional theory cases, you have to plausibly allege the conspiracy. But you also have to allege what you're imputing, if you have plausibly alleged a conspiracy, is you're imputing to the defendant mobilization, fundings, purposeful contacts with South Carolina in furtherance of the conspiracy. And is there somewhere in the complaint where you allege, like, I actually don't know, what is mobilization funding doing in South Carolina in furtherance of the conspiracy? Mobilization funding, the lender, is a South Carolina company, is receiving the funds. But you don't allege that they incorporated in South Carolina sort of in furtherance of the conspiracy. South Carolina has law that's going to facilitate the conspiracy. No, there weren't. The company wasn't formed pursuant to the conspiracy, although the company was acting to induce the Stokes to guarantee the loan, to have payments from the Florida. They met at the Stokes in South Carolina to do that. I'm really trying, your complaint, I think this goes back to the fact that you didn't actually argue this theory in the district court. The complaint is kind of short on details about where mobilization funding was doing certain things. Mobilization funding was always acting in South Carolina. It's where its office is. It's where it's incorporated as an entity. It's where its president is. Where is it headquartered? Beaufort, I believe, is the name of the town. Beaufort. Beaufort. Sorry. I'm from Tennessee. But mobilization funding was receiving the payments from the Florida contract through Westerfeld and using it for its own purposes. Okay. But as I understand, the way the money goes, it goes from the state of Florida to Westerfeld? Yes. And the bank account that money gets dumped into is in Florida. Right. But it's a joint bank account. But it's in Florida. It's in Florida. Yes, sir. Okay. It's not a South Carolina bank account. Okay. And so then the allegation is that Westerfeld's asserted co-conspirator then pulls money out of that, and the co-conspirator is in South Carolina? That's the theory? Well, yes. I mean, Westerfeld is cooperating with the South Carolina entity to use these funds for improper purposes. One difference between this case and a lot of the cases where they said conspiracy had not been alleged is here the co-conspirator is a citizen of the state of South Carolina. Everything it does is in South Carolina. There's general personal jurisdiction over the co-conspirator, the lender. Sure. But we've never said that that can get you general personal jurisdiction over it. No. No.  Say I am a person who lives in Maryland enter into a criminal conspiracy. Yes. And let's say that all of the activities in furtherance of that conspiracy take place in Virginia, and I live in Virginia. You can't sue me in Maryland just because I'm in a conspiracy with a person who themselves is subject to general personal jurisdiction. Or at least I'm not aware of any case that says you are. All of the lender's conduct occurred in South Carolina. Okay. But you don't disagree that simply because someone is a co-conspirator of another person who is subject to general jurisdiction in another state, that the co-conspirator then necessarily also becomes subject to personal jurisdiction. No. Merely the existence of a conspiracy. No. It would be specific jurisdiction for the party by virtue of the conspiracy. But the right you impute the contacts of your co-conspirator. Right. Here. You impute the contacts that were taken in furtherance of the conspiracy, not every single contact they have. And here that conduct occurred in South Carolina. Okay. Thank you. The other parts of the complaint, I think in particular pages 175 and 176, 203 to 205, and page 214 of the joint appendix have very specific allegations concerning this joint conspiracy. I will allow Mr. Bible to speak. May it please the court. I'm Mark Bible, and I represent Westerfeld Construction by Glick. For simplicity's sake, I prefer to refer to Westerfeld as just Westerfeld, and the appellants as either the appellants or the GSH parties. First and foremost, I'd like to thank the panel for this opportunity. To start off, I'd like to address a few points that my colleague made in his opening arguments. Essentially, when asked whether the contacts that mobilization funding participated in were in South Carolina, my colleague indicated that they all were conducted in South Carolina. But that is actually far from the truth. In actuality, what happened was that Scott Pieper, a principal CEO of mobilization funding, who is a resident of the state of Florida, would communicate with the several parties via the Internet and via e-mail. And in that process, there were communications where Mr. Pieper introduced the GSH parties to my client for the purposes of potentially using the GSH parties as a subcontractor in the Rebuild Florida project, a project that was wholly performed in the state of Florida, and that the money for that project came solely from the state of Florida. And I'd like to also mention that when the money got paid to Westerfeld, related to Jessup Construction's performance of work on that project, that money got placed into a bank account. That bank account was with Valley National Bank. Valley National Bank does not maintain any offices or branches in South Carolina. There were several states, and I believe the appellee's brief mentions the location of those branches. However, the money was deposited in a Valley National Bank account. And at that point, the loan documents that are part of the record indicate that mobilization funding itself had the ability to debit the money out of that account and apply it to the loan. In fact, the funds control agreement that my colleague cited to you in Joint Appendix 416 and 419 even says at the second page that mobilization funding may apply the funds that enter into the account to the loan principal and or interest. And, in fact, the loan documents, specifically the loan agreement, indicates that same exact authority. All of these documents, importantly, were the subject of review before the GSH parties, the Jessup parties, and or the mobilization funding parties executed these documents. And I mention that, importantly, because there are a plethora of broad allegations, not specific allegations, in the complaint that indicate that my client induced the GSH parties into personally guaranteeing the note with mobilization funding. Well, they are self-proclaimed sophisticated parties in their complaint. They indicate that they are industry leaders for this type of disaster relief work. They were presented with the loan documents before they had to sign them. They had every opportunity to consult with parties to determine whether or not execution of a personal guarantee of $5.8 million was going to be a feasible solution for them. In fact, the only pleading that I'm aware of that the appellants expressly attribute to something that was said by Westerfeld was that the GSH parties may be entitled to receive $3 million for its performance of work on the Rebuild Florida project. Well, they, in fact, they say that they promised a $3 million payment. But, in fact, the pleadings say they may be entitled to a $3 million payment. But that necessarily implies that GSH properly performed on the project, did all of its work in a timely manner. And, in fact, that is not what we have here today. Unfortunately, there are no, in my estimation, 4th Circuit decisions that expressly reference the facts that we are here to bear. In this case, must make a plausible claim that a conspiracy existed, that Westerfeld Construction participated in that conspiracy, and that that mobilization funding's actions in furtherance of that conspiracy had sufficient contacts with the state of South Carolina such that they could subject Westerfeld Construction by Glick to jurisdiction in the state. And, in this case, again, the pleadings that are cited by mobilization funding are just bare allegations. And that is what the district court found, and that is what we have argued in our brief. They go to say, without telling us, again, who told the GSH parties this information, they just broadly allege that mobilization funding and Westerfeld collaborated with one another to induce them into entering into the loan documents, and specifically the personal guarantees. They indicate that mobilization funding collaborated with Westerfeld Construction to siphon funds from them, when, in fact, the loan documents that they executed give mobilization funding the very right that they complain about, without any action or involvement, without even the first dime of money coming from the state of Florida to any bank account. So, I'd like to draw that distinction to this court. The other arguments that are presented by the appellant deal with whether or not jurisdictional discovery was. Before we move on, can I just ask you? I asked your colleague about whether this whole conspiracy theory of jurisdiction had been raised in the district court, and I understood him to say no, but you guys don't seem to mind. So, do you have a view on that? Yes, Your Honor. It was not, in fact, expressly raised in the district court pleadings. Unlike my colleague, I've had the benefit of participating in the lower court proceedings. What I understand that they have done is really just allege a cause of action for conspiracy, but did not argue that when I filed the motion to dismiss on behalf of Westerfeld. They did take the position, of course, in the lower court pleadings, specifically in their reply to my memorandum in support that they had alleged specific plausible facts. But, again, when we replied to that, we indicated again that these are not specific facts. They are very broad allegations. We did not intend to waive any challenges to their now asserting conspiracy theory of jurisdiction, but it was not articulated to the lower court, Your Honor. But you, for example, did not say in your red brief, say, this argument was totally waived or forfeited before the district court. That is nowhere in your red brief. I did not, Your Honor. I did not. So the next argument that the appellants make in their brief was essentially that the court improperly denied jurisdictional discovery. In this case, of course, it's a prima facie standard, and the court has a plethora of avenues that it could use to determine whether the prima facie standard had been satisfied by the appellants. In this case, the appellants did not expressly raise that they wanted to conduct jurisdictional discovery. Their request for discovery is but a note in the conclusion paragraphs of each of their responsive briefs in the lower court, indicating that the court should allow discovery to continue. And it did not say that discovery should be focused on jurisdictional issues that are before the court. They did not raise that issue. They did not make a motion to have the court conduct or allow the conduct of jurisdictional discovery. Did your colleagues ever move to file an amended complaint to make more fulsome jurisdictional allegations? They did not, Your Honor. Your Honor, in fact, the ongoings of the district court matter currently. They've amended their pleadings to assert direct causes of action against the principal of Westerfeld, and in fact have used the very same exact complaint that we're focusing on here today. They have not changed any of the factual allegations. So they have remained in place essentially for the better part of a year with the same facts that they've alleged in the amended complaint that you are considering before you. But, again, I'd like to mention that the failure to make the motion for jurisdictional discovery is very similar to the case of McLaughlin versus McPhail where that party did make a motion for jurisdictional discovery, but the court still denied that motion, which is evidence that the court has very broad discretion on whether or not to allow discovery. And when the courts have held, when the party opposing dismissal for personal jurisdiction reasons only alleges bare allegations or conclusory statements, courts have found that there's no need to conduct a, to subject the party seeking to be dismissed from this jurisdiction to the discovery process. The courts have gone on to say if the court believes that the jurisdictional discovery would be no more than a fishing expedition, then the court could properly deny that jurisdictional request. So we believe that the court did not abuse its discretion in denying jurisdictional discovery. Had the appellants asserted more specifics as to what Westerfeld Construction actually did in furtherance of any common scheme, I believe that the court should have allowed jurisdictional discovery. But based on the bare allegations of the claim, that was unnecessary. Lastly, the appellants focus on a supplemental affidavit that my client furnished on behalf of Westerfeld Construction. In that affidavit, it essentially says that Westerfeld Construction did not consent to or did not enter into any agreements through which it consented to jurisdiction in South Carolina. The appellants contend that that was raising a new issue rather than something that was properly before the court in the original memorandum in support of the motion to dismiss for lack of personal jurisdiction. However, I wanted to clarify that that Can I just ask you about something that you said that has been rattling my brain? So after this appeal was filed, your friends on the other side have now tried to sue Westerfeld in the District of South Carolina again? They've not sued Westerfeld. They've sued Brandon Bay, who is Westerfeld's only member in management. OK, but not Westerfeld. Not Westerfeld. I was running into a final judgment. I don't understand how the case of them versus Westerfeld can simultaneously be before us and before the district. I apologize if I misled you. That was not my intention. So, Your Honor, they just alleged complaint. The same exact complaints against Brandon to move on to the motion to strike again. The point that I wanted to raise about the affidavit was it did not fundamentally change what was stated in Mr. Bay's original affidavit that was that was submitted in support of Westerfeld's motion to dismiss. It just merely clarified that of all the agreements to the extent an agreement exists, not one of them that Westerfeld is a party of did Westerfeld consent to jurisdiction in the state of South Carolina. That is an issue that's well before the court in Westerfeld's motion to dismiss because we're saying that the original affidavit of Mr. Bay indicated that there were no contacts with the state of South Carolina. Westerfeld doesn't do any business in the state of South Carolina. Westerfeld doesn't engage in long-term contacts with any resident of the state of South Carolina and didn't enter into any agreements with a party with the state of South Carolina. We thought that it would be most accurate and truthful to supplement that affidavit to say that there is no contract in total where Westerfeld consented to jurisdiction. Now, the appellants argue in a way that the funds control agreement, and that's again Joint Appendix 416 to 419, imputes some third-party beneficiary theory on Westerfeld because it has an indemnity provision in it. The indemnity gives favor to Westerfeld in the event that Jessup or any party claiming buyer through Jessup seeks to sue Westerfeld as a result of its participation in transferring funds out of a Westerfeld joint account into the Jessup account for payment. Ultimately, we contend that that indemnity provision doesn't provide Westerfeld anything more than what the Westerfeld and Jessup subcontract provide. There's express indemnity language in there that prevents or subjects Jessup to indemnify Westerfeld in the event of third-party claims brought by people exactly like this, the GSH parties, for nonpayment or for some payment-related dispute. There's indemnity in the Jessup subcontract for that. So I would represent to the court that mobilization funding might have inserted that indemnity language into the funds control agreement, but my client did not participate in review or sign the funds control agreement. It's not a party to it, nor does it intend to invoke the indemnity provision of that agreement because my client already has indemnity built into the Jessup subcontract that would accomplish the same task. There was no benefits conferred. Lastly, and we'll be circling back around on the jurisdiction issue, one of the allegations that's made by the appellants is that Westerfeld participated in a referral partnership program with mobilization funding. To allege this fact, what they have done was cited a link to mobilization funding's website. Mobilization funding's website takes you to a page that says, we offer a referral partnership program. There is nowhere in that website that it refers to Westerfeld construction. There is no evidence, whether specific pleadings or otherwise, that indicate that my client participated in any referral program or received any proceeds from mobilization funding. And, in fact, the parties have had the opportunity to participate in discovery up to this point in the lower court, and you would think if that existed, they would have supplemented the record with that relevant material, but that did not happen. Your Honors, again, I appreciate this opportunity and I'll yield my time. Thank you. Thank you, Mr. Bible. I'd like to clear up just a few points. First, there is nothing in the joint appendix that says Mr. Pieper lives in Florida. Okay. Is there anything that says he lives in South Carolina? It just doesn't say where he lives. But that's your problem. Well, it's not, respectfully, because he's acting on behalf of mobilization funding, which is a South Carolina entity. Where is its principal place of business? I believe it's in Beaufort.  It's not in Florida? No, it's in South Carolina. Beaufort. I know it's incorporated and I know there's an office in South Carolina, but you're saying its principal place of business is in South Carolina. The record that is before the court on this appeal, I don't see where it says specifically where its principal place of business is. You're the one who's trying to establish jurisdiction. I mean, the court could take judicial notice of a later filing, which shows that its principal place of business is in South Carolina. I thought even in the complaint, let me see if I can find it. I thought that you even alleged that the principal place of business was in Tampa. I don't. In which document? In Tampa. The principal place of business is in Tampa, Florida. I don't recall that, Your Honor. Let me give you more. I can say that none of our briefing in this appeal makes any statement about where the principal place of business of mobilization funding is. So the choice of law provision in the loan documents is crucial. Mobilization funding said, if we're going to litigate over this loan, we're going to do it in South Carolina. That is a crucial jurisdictional fact. Well, it is. But again, I think you'd have to be alleging that that was done in furtherance of the conspiracy. Again, that the choice of law clause was in there to further the conspiracy. Well, I think here, Your Honor, the liberal standard comes into play. And that is, the court has, because this is a prima facie question, not a preponderance of the evidence. So can I, I know what you mean. Right. But you construe all this in the plaintiff's favor. Well, yeah, can I ask you a question about that? So we do, the Fourth Circuit has endorsed this conspiracy theory of jurisdiction. But some other courts haven't, and they pointed out that it's in pretty significant tension with all the times the Supreme Court has said, no, no, personal jurisdiction, it really has to be based on your own conduct, not somebody else's conduct. And it does strike me that given that tension, we'd probably want to apply this theory of conspiracy jurisdiction pretty strictly. If we apply it too broadly, we really are running into this problem with all the times the Supreme Court has said, like you really can't drag Westerfeld into court because somebody else drafted a contract and signed it. I respectfully disagree, Your Honor. The conspiracy theory is binding law in this circuit. It is, but. Walden. Can I. Walden did not. Can I finish? Yes, Your Honor. I'm sorry. Are you aware of any cases where, there are cases where we've endorsed the theory. Are you aware of any in which we've actually found that the standard is satisfied? Because it looks to me like we actually apply it pretty strictly. In those cases, I mean, Doe v. Mast, which is in the brief, 741F sub 3409 is an example where. Where we said. No, it was not the Fourth Circuit. It's a district court. And Spring Industries, which is in the brief, was a district court case. And the BeoCare case, which is another case, a district court case. All of those found there was jurisdiction. The difference between this case and Loehlevar and Unspam, they're far, far more specific allegations of specific conduct in this case than in those cases. In those cases, like McLaughlin, they just said they conspired. There was conspiracy. With no specific conduct identified, no common plan described. The complaint, it doesn't say it all in one place. But the complaint in this case very specifically alleges conduct, statements, collaboration. Well, it seems like, like, on the claim of inducement on, I'm asking, like, what is your evidence of inducement? The only thing that it seems like you're citing is the terms of the agreement. No, if they wanted them, that the conspirators wanted the Stokes to guarantee this loan because they wanted to obtain the money from that project and use it for their own ends, perhaps to pay back their own loan, and that they were making false statements to the Stokes to induce them to make that guarantee. They later diverted funds for their own use. They kept the Stokes in the dark. They refused to share information with them. And then now they are relying on these very broad onerous advance releases of liability in the loan documents to say, well, we kept your money and now we're going to sue you for loan default. That's the conspiracy. All of that is very specifically alleged in the complaint, including at the pages I mentioned. I'm sorry. Yes, Your Honor. Regarding the principal place of a business, it's on JA-176, where you said that MF2 is a South Carolina limited liability company with its principal place of business in Tampa, Florida. Okay. I'm sorry, Your Honor. I missed that. But it's a South Carolina company. There would be general personal jurisdiction over the lender in South Carolina. Walden should not change this court's application of binding precedent concerning conspiracy theory. If you look at Doe v. Mast, 741 F. Sep. 3, 409, it discusses this in detail, how Walden did not change the analysis. And that's correct. A conspiracy is the defendant's own conduct. You are looking at the defendant's own conduct when you're looking at a conspiracy. Right? There is a Second Circuit case that was not briefed. I'd be happy to give the court a citation to that, that mentions Walden in relation to conspiracy theory. That's N. Re. Platinum, 61 F. 4th, 242. 61 F. 4th, 242, which is the Second Circuit case that mentions that. I don't think the court should apply the doctrine strictly. I don't think Walden or other Supreme Court cases since Walden require that. Thank you very much. I appreciate your time. And we will come down and re-counsel. Go ahead for our next case.
judges: Pamela A. Harris, Toby J. Heytens, DeAndrea Gist Benjamin